J-A11043-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TUAN T. VO | : | |
| | : | |
| Appellant | : | No. 1026 MDA 2023 |

Appeal from the Judgment of Sentence Entered January 18, 2023
In the Court of Common Pleas of Bradford County Criminal Division at
No(s): CP-08-CR-0000173-2022

BEFORE: BOWES, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: MAY 30, 2024**

Tuan T. Vo (Appellant) appeals from the judgment of sentence entered following his convictions by a jury of two counts each of possession of controlled substances, possession with intent to deliver controlled substances (PWID), and criminal conspiracy-PWID.[1]   After careful consideration, we affirm.

The trial court summarized the relevant underlying facts:

The [Sayre Borough] police were surveilling [] Destiny Barnes [(Barnes)] in a hotel room[,] believing that she was distributing controlled substances.  Police heard Barnes speaking on the telephone.  They then heard her advising other individuals in her hotel room that they had to leave because the "re-up" was on its way.  A "re-up" is a delivery of drugs.  Upon the door opening, the police detained everyone in the room.  Several were females. While the individuals were being detained, one of the officers, [Sayre Borough Police Sergeant] Bruce Hoffman, left the room

---

[1] **See** 35 P.S. § 780-113(a)(16), (30); 18 Pa.C.S.A. § 903.

and hotel so that a female officer could replace him to assist in searching the female suspects. While [Sergeant] Hoffman was walking through the hotel lobby, he saw Appellant and Codefendant, Kara Mason [(Mason)], walking into the hotel lobby. Appellant looked back at [Sergeant] Hoffman 2-3 times. [Sergeant] Hoffman contacted the officers that were in the hotel room to advise them he believed the [two] individuals were coming to the hotel room. The [two] individuals did. They were also detained. [While detained,] Appellant told Mason numerous times to not say anything. When the female police officer arrived, she took Mason to the bathroom and searched her wherein she found methamphetamines and fentanyl packets in her underwear. Upon returning Mason to [the] detaining area, Mason advised [two] officers that "he made me hold the drugs", "he made me hold the drugs for him". … []Mason did not testify at trial.

Appellant was eventually permitted to leave the scene. Upon leaving the scene, however, although he was provided with the keys, he did not take the vehicle that he and Mason had arrived in. Later the police seized the vehicle, obtained a search warrant and found an Armani leather bag with additional methamphetamine and fentanyl in it. The Armani leather bag was linked to Appellant as a bag he was wearing in a picture.

Trial Court Opinion, 11/17/23, at 2 (unnumbered).

Appellant subsequently was charged with the above-mentioned crimes. The matter proceeded to a jury trial on November 15, 2022. The jury convicted Appellant of the crimes described above.[2] On January 12, 2023, the trial court sentenced Appellant to an aggregate prison term of 214 to 440 months. The trial court entered amended sentencing orders, for reasons not pertinent to this appeal, on January 13, 2023, and January 18, 2023.

---

[2] The jury acquitted Appellant of one count of criminal use of a communication facility, 18 Pa.C.S.A. § 7512(a).

On March 23, 2023, Appellant filed a counseled petition for permission to file a post-sentence motion, *nunc pro tunc*. The trial court granted the petition for permission on April 13, 2023, and scheduled Appellant's post-sentence motion hearing for May 23, 2023. The trial court denied Appellant's *nunc pro tunc* post-sentence motion on June 29, 2023. On July 18, 2023, Appellant filed a notice of appeal.

On December 28, 2023, this Court issued a rule to show cause why the appeal should not be quashed as untimely filed. **See Commonwealth v. Capaldi**, 112 A.3d 1242, 1244 (Pa. Super. 2015) (noting that a post-sentence motion *nunc pro tunc* may toll the appeal period only if two conditions are met: (1) within 30 days of the imposition of sentence, the defendant must request the trial court's permission to file a *nunc pro tunc* post-sentence motion; and (2) also within 30 days of the imposition of sentence, the trial court must expressly grant defendant permission to file a *nunc pro tunc* post-sentence motion); **see also Commonwealth v. Vinson**, 249 A.3d 1197, 1204 (Pa. Super. 2021) (citing **Commonwealth v. Ballance**, 203 A.3d 1027, 1032 (Pa. Super. 2019), and stating that absent a proper and timey filed post-sentence motion, the event triggering the appeal run date remains the date the sentence was imposed; an untimely post-sentence motion labeled a "*nunc pro tunc*" filing does not toll the time an appeal may be filed following imposition of sentence).

Appellant filed a response indicating that counsel emailed his post-sentence motion to the Bradford County Court Administrator within 10 days of sentencing, but the motion was not docketed. Response to Rule, 1/6/24, ¶ 9. Notwithstanding, Appellant filed his *nunc pro tunc* post-sentence motion over two months after sentencing.

This Court has recognized that "the time for filing an appeal can be extended beyond 30 days after the imposition of sentence only if the defendant files a **timely** post-sentence motion." **Commonwealth v. Green**, 862 A.2d 613, 618 (Pa. Super. 2004) (*en banc*) (emphasis added). "An **untimely** post-sentence motion does not toll the appeal period." **Capaldi**, 112 A.3d at 1244 (emphasis in original). Thus, Appellant's *nunc pro tunc* post-sentence motion did not toll the appeal period.

Nevertheless, this Court has recognized, the Post Conviction Relief Act[3] (PCRA) "provides the sole means for obtaining collateral review, and **any petition filed after the judgment of sentence becomes final will be treated as a PCRA petition**." **Commonwealth v. Johnson**, 803 A.2d 1291, 1293 (Pa. Super. 2003) (emphasis added). "[R]egardless of how a petition is titled, courts are to treat a petition filed after a judgment of sentence becomes final as a PCRA petition if it requests relief contemplated by the PCRA." **Commonwealth v. Fantauzzi**, 275 A.3d 986, 995 (Pa. Super. 2022).

---

[3] 42 Pa.C.S.A. §§ 9541-9546.

Based on the foregoing, we consider Appellant's *nunc pro tunc* post-sentence motion to be a successful, timely filed PCRA petition. As the trial court granted PCRA relief, and Appellant timely filed his notice of appeal following the denial of his *nunc pro tunc* post-sentence motion, we decline to quash his appeal.

Appellant presents the following issues for our review:

1. Whether [Appellant] was denied his right to confront adverse witnesses, as guaranteed by the United States and Pennsylvania Constitution[s], when [Sayre Borough Police] Officer [Jeremy] Horton introduced testimonial statements made by an unavailable co-defendant, [] Mason, without [Appellant] having the opportunity to cross-examine [] Mason.

2. Whether [Appellant] was prejudiced when inadmissible hearsay testimony was introduced against [Appellant] regarding a statement made against him by an unavailable co-defendant, [] Mason.

Appellant's Brief at 3. We address Appellant's claims together, as they are related.

Appellant first argues the admission of Sayre Police Officer Jeremy Horton's testimony regarding the statement made by Mason at the scene, "he made me hold the drugs for him[,]" violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. *Id.* at 20. Appellant argues that in ***Crawford v. Washington***, 541 U.S. 36 (2004), the United States Supreme Court held that the Confrontation Clause

> [p]rohibits the introduction of testimonial statements by a non[-]testifying witness, unless the witness is unavailable to testify, and the defendant had a prior opportunity for cross-examination.

*Id.* at 23 (quoting ***Ohio v. Clark***, 576 U.S. 237, 243 (2015), in turn quoting ***Crawford***, 541 U.S. at 54). According to Appellant, the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution both "protect an accused's rights to confront adverse witnesses." Appellant's Brief at 20. Appellant states, "the federal right to be confronted with such witnesses … includes the right to conduct reasonable cross-examination." *Id.* (internal quotation marks and citations omitted).

Appellant points out that before trial, he objected to Officer Horton's proposed testimony quoting Mason's statement. *Id.* at 21. However, the Commonwealth claimed the statement falls within the coconspirator exception to the rule against hearsay. *Id.* Appellant argues, "the Commonwealth incorrectly assumed that hearsay and the Confrontation Clause are one in the same—they are not." *Id.*

Appellant claims the admission of Officer Horton's testimony about Mason's statement violated his Confrontation Clause protections, as it is testimonial in nature. *Id.* 24. He asserts Mason's hearsay statement showed no "ongoing emergency," as required by ***Crawford***, and the statement was made **after** Mason had been detained and formally arrested. *Id.*

Appellant further claims Officer Horton's testimony does not fall within any exception to the hearsay rule:

> [T]he United States Supreme Court and the Pennsylvania Supreme Court have held that "[s]tatements made to the authorities by a non-testifying accomplice which inculpate the defendant more than the accomplice are not admissible pursuant

> to a firmly rooted exception to the hearsay doctrine." ***Commonwealth v. Robins***, 812 A.2d [522, 524] (Pa. 2000)[,] *quoting* ***Commonwealth v. Young***, 748 A.2d 166, 192 (Pa. 2000).

Appellant's Brief at 12. Citing ***Robins***, Appellant asserts that Mason's statement implicated Appellant more than Mason; therefore, it is not admissible. ***Id.*** at 13.

Appellant further argues the co-conspirator exception does not apply, because Mason's statement was not made in furtherance of any conspiracy. ***Id.*** at 15. According to Appellant, Mason made the statement following her arrest, and after requesting to use the restroom. ***Id.*** at 16. Once inside the restroom, Appellant argues, Mason was found to possess narcotics, and blamed Appellant. ***Id.*** Appellant explains,

> because [] Mason's statement implicating [Appellant] was made after the alleged conspiracy terminated, [] Mason's statement lacked the indicia of reliability that gives the co-conspirator exception its trustworthiness.

***Id.*** at 16-17 (citation omitted).

We review trial court rulings on the admissibility of evidence for an abuse of discretion. ***Commonwealth v. Thompson***, 576 U.S. 237, 754 (Pa. Super. 2014). Not merely an error in judgment, an abuse of discretion occurs when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record." ***Commonwealth v. Cooper***, 941 A.2d

655, 667 (Pa. 2007) (quoting *Commonwealth v. McAleer*, 748 A.2d 670, 673 (Pa. 2000) (citation omitted)).

This Court has stated,

Whether a defendant has been denied his right to confront a witness is a question of law for which our standard of review is *de novo* and our scope of review is plenary. *See Commonwealth v. Brown*, … 185 A.3d 316 (Pa. 2018) (plurality). The Confrontation Clause of the Sixth Amendment prohibits out-of-court **testimonial statements** by a witness, even if they are otherwise admissible as an exception to the rule against hearsay, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.

*Commonwealth v. Fitzgerald*, 284 A.3d 465, 470 (Pa. Super. 2022) (emphasis added; citation omitted).

In *Davis v. Washington and Hammon v. Indiana*, 547 U.S. 813 (2006), the United States Supreme Court applied a "primary purpose" test to determine whether statements are testimonial or nontestimonial in nature:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822.

Our Supreme Court has recognized,

**[I]n analyzing whether a statement is testimonial, and, therefore, subject to the protections of the Confrontation Clause … , a court must determine whether the primary purpose of the interrogation was to establish or prove past events relevant to a later criminal prosecution.** In making

the determination as to the primary purpose of an interrogation, a court first should determine whether the interrogation occurred during the existence of an ongoing emergency, or what was perceived to be an ongoing emergency. Although the existence— actual or perceived—of an ongoing emergency is one of the most important factors, this factor is not dispositive because there may be other circumstances, outside of an ongoing emergency, where a statement is obtained for a purpose other than for later use in criminal proceedings. **In determining the primary purpose of an interrogation, a court must also objectively evaluate the circumstances surrounding the interrogation, including the formality and location, and the statements and actions of both the interrogator and the declarant.**

*Commonwealth v. Allshouse*, 36 A.3d 163, 175-76 (Pa. 2012) (emphasis added).

In *Michigan v. Bryant*, 562 U.S. 344 (2011), the United States Supreme Court expounded on testimonial versus nontestimonial evidence:

Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial. When, … the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause. But there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant. **Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.**

*Id.* at 358-59 (footnote omitted, emphasis added). Further,

[a]n objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the

- 9 -

interrogation." The circumstances in which an encounter occurs-- *e.g.*, at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards -- are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.

*Id.* at 360 (footnote omitted). "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Crawford*, 541 U.S. at 68. With this in mind, we review whether Mason's hearsay statement was testimonial in nature.

At trial, the Commonwealth presented the testimony of Sergeant Hoffman. N.T. (Volume I), 11/15/22, at 18. Sergeant Hoffman testified he served as a Sayre Borough police officer for approximately 18 years. *Id.* at 19. On January 5, 2022, Sergeant Hoffman was involved in the investigation of Barnes for selling narcotics, "mainly heroin, … fentanyl and methamphetamine out of the Best Western [Hotel]" located in Sayre Borough *Id.* at 21.

Sergeant Hoffman explained officers had a search warrant for Barnes's hotel room. *Id.* He testified,

[w]e basically requested [] the hotel worker and they contacted the manager to get an adjacent room, so we were actually the room across from [] Barnes; had multiple officers there as well as [o]fficers in the parking lot in unmarked vehicles and conducted

surveillance of people coming and going from that room. Also a lot of people that were known[] narcotics users.

*Id.* at 21-22.

Sergeant Hoffman stated that he and the officers listened to the activities in Barnes's room for about 30 minutes. *Id.* at 23. During that time, Barnes

took a phone call and said that her guy was coming – something to the effect the guy was coming and everyone had to leave the room and that's when they opened the door.

*Id.* at 23-24. Sergeant Hoffman explained that Barnes indicated that a man was coming to "re-up," which meant that Barnes had run

out of product. There was a large amount of cash in the room as well. … I took that as she had ran [*sic*] out of product and more drugs were being delivered to sell.

*Id.* at 25.

Sergeant Hoffman testified police waited to execute the search warrant until someone opened the door to Barnes's room. *Id.* at 24. He stated, "As soon as they opened the door, we went in." *Id.* Inside the room, Sergeant Hoffman discovered

some heroin/fentanyl in the room[.] [T]here was also some cutting agent to cut heroin, a lot of paraphernalia, scales, a ledger of who owes what/who, things like that.

*Id.* at 25.

Sergeant Hoffman then left the room for the purposes of picking up Sayre Borough Police Officer Nikki Hoffman (Officer Hoffman), his wife. *Id.* Sergeant Hoffman explained that Barnes had been placed in custody, "and we

- 11 -

needed a female officer to search her." *Id.* After leaving Barnes's fourth-floor hotel room, Sergeant Hoffman took an elevator to the lobby:

> I got out of the elevator, turned right through the lobby, about mid-way in the lobby I pass [Appellant] … and … Mason.
>
> ….
>
> I kept walking straight towards the door but as I was walking straight I was looking at the glass of the door and the reflection and [Appellant] turned around and looked at me two or three times.

*Id.* at 26. Sergeant Hoffman sent a group text to the surveillance team stating, "you have two coming up, as in two individuals [*sic*] suspect that the re-up is coming up the elevator." *Id.* at 26-27.

Officer Horton next testified. Officer Horton explained that he has been a police officer for 24 years. *Id.* at 53. Officer Horton testified that on January 5, 2022, he was stationed outside of Barnes's hotel room during the execution of the search warrant. *Id.* at 54. Officer Horton observed Appellant as the elevator doors opened to the fourth floor. *Id.* at 55. Officer Horton testified,

> initially[,] I just looked as the doors opened … [and] saw the two people standing there and both of their expressions were of pure shock, surprise and [Appellant], … I believe his words were oh shit.
>
> ….
>
>     … [T]hey stood there somewhat frozen right at the entrance to the door. We told them to … come out. At that point in time[,] because of the fact we're engaging in a … drug or a narcotics warrant and the potential dangers with that, believing that these two people were there to enter that room to do the re-up … we brought them aside, did an initial pat search, frisk[ed] them for

- 12 -

weapons and detained them with the other people we had brought out from the room that we were serving the search warrant on.

*Id.* at 55-56.

Officer Horton stated that Appellant

was very vocal, extremely upset … was asking why he was being detained. Was telling us that we had no right to stop or talk to him, he was telling … [Mason] to keep her mouth shut[,] not to say anything[,] not to talk to us. So … he was very verbal.

*Id.* 56-57. According to Officer Horton, Appellant told Mason to keep quiet

[n]umerous times. Keep your mouth shut. Don't talk to them. You don't have to say anything to them. Words to that effect numerous times.

*Id.* at 57.

Officer Horton testified that Mason requested to use the bathroom numerous times:

[Mason] … was sitting on the ground, [] she was very nervous, [] she made numerous requests … for some female/feminine products. We couldn't provide that at the time. I was able to offer her toilet paper from one of the ... rooms. She told us she was having her period[,] that she needed to go to the bathroom, she needed to clean herself up. Unfortunately [*sic*] had to explain to her … in cases like this women/females have often secreted drugs and drug paraphernalia inside their vaginas and we would not be allowing that trip to the bathroom until she had been searched.

….

… [O]nce Officer [] Hoffman arrived on the scene, she took [] Mason to another – actually the same room that we were staging in prior to the service of the search warrant. Took her in there, took her … into the bathroom ….

- 13 -

*Id.* at 59-60. At that time, Mason said that "he made me hold the drugs for him." *Id.* at 61. However, Mason did not indicate who "he" was. *Id.*

The evidence established Mason's statement was not made "to enable police assistance to meet an ongoing emergency." *Clark*, 576 U.S. at 244. The scene was secured prior to Mason's arrival on the fourth floor, and she had been seated for some time. Further, the actions of Officer Hoffman reflect that Mason made the statement while being subject to the physical search for evidence, the physical equivalent of an interrogation. *See Allshouse*, 36 A.3d at 175-76.

In addition[,] the evidence established that the objective intent of Officer Hoffman was to secure evidence potentially relevant to a later criminal prosecution, not to resolve an ongoing emergency situation. Under these circumstances, we are constrained to conclude that Mason's statement during a police search was testimonial, and that its admission, when Appellant had "no opportunity to cross-examine her," was "sufficient to make out a violation of the Sixth Amendment." *Crawford*, 541 A.2d at 68; *Robins*, 812 A.2d at 522.

Moreover, we conclude Mason's statement is not admissible under any exception to the rule against hearsay evidence.

"[H]earsay is an out of court statement offered for the truth of the matter asserted and is inadmissible unless it falls within an exception to the hearsay rule." *Commonwealth v. Manivannan*, 186 A.3d 472, 480 (Pa.

Super. 2018) (citation omitted); Pa.R.E. 801(c). Our Rules of Evidence permit

the admission of a statement "made by the party's coconspirator during and

in furtherance of the conspiracy." Pa.R.E. 803(25)(E).

> Application of the coconspirator exception to the hearsay rule is
> predicated on agency principles—when the elements of
> the exception are established, each conspirator is considered an
> agent of the other, and therefore, a statement by one represents
> an admission by all.

***Commonwealth v. Holt***, 273 A.3d 514, 543 (Pa. 2022). The exception

contains three elements:

> [(1)] the existence of a conspiracy between the declarant and the
> defendant must be demonstrated by a preponderance of the
> evidence; [(2)] the statements must be shown to have been made
> during the course of the conspiracy; and [(3)] they must have
> been made in furtherance of the common design.

***Id.*** (citation omitted).

Rule 804 further provides a hearsay exception for a statement against

the declarant's interest:

> [**(b)**] **(3) Statement Against Interest**. A statement that:
>
> (A) a reasonable person in the declarant's position would have
> made only if the person believed it to be true because, when
> made, it was so contrary to the declarant's proprietary or
> pecuniary interest or had so great a tendency to invalidate the
> declarant's claim against someone else or to expose the declarant
> to civil or criminal liability; and
>
> (B) is supported by corroborating circumstances that clearly
> indicate its trustworthiness, if it is offered in a criminal case as
> one that tends to expose the declarant to criminal liability.

Pa.R.E. 804(b)(3). However,

> [s]tatements made to the authorities by a non-testifying accomplice **which inculpate the defendant more than the accomplice** are not admissible pursuant to a firmly rooted exception to the hearsay doctrine ….

*Robins*, 812 A.2d at 522 (emphasis added; citation omitted).

Instantly, Mason's hearsay statement did not fall within the coconspirator exception to the hearsay rule. While the Commonwealth presented evidence of a conspiracy between Mason and Appellant, it failed to establish Mason's statement was made *during the course of* the conspiracy. *See Holt*, 273 A.3d at 543. At the time Mason made her statement, she and Appellant were in police custody. Any conspiracy to deliver drugs to Barnes had ended.

Additionally, Mason's statement was not *in furtherance* of the conspiracy. As this Court has explained,

> [t]he exception "contains no requirement that the conspiracy identified as the basis for admissibility be related to the crime charged." [**Commonwealth v. Johnson**, 838 A.2d 663, 676 (Pa. 2003)]. Accordingly, "in order to satisfy the in-furtherance-of requirement of the coconspirator hearsay exception, it is sufficient for the government to establish an intent to promote the conspiratorial objective." *Id.* at 675. In **Johnson**, the appellant Raymond Johnson was convicted of murdering Louis Combs. The evidence established that Johnson and Combs were rival drug dealers. Nicole Ramsey testified that she sold drugs for Johnson and was present for conversations between Johnson and a man known as "Izod," whom she identified as Johnson's "right-hand man," regarding a plan to eliminate Combs. *Id.* at 679. On the day of Combs's murder, Johnson testified that Izod told her, "we did them n _ s_. You didn't think we would, but we did. There is not going to be a problem." *Id.* at 670. We determined that the evidence was admissible under the co-conspirator exception to hearsay.

- 16 -

> Here, as ***Johnson*** essentially concedes, the Commonwealth's evidence demonstrated, by a clear preponderance, a larger conspiracy between Appellant and Izod to distribute illegal drugs. Significantly, this is a conspiracy as to which the evidence demonstrated that Ramsey was not a third party, but a participant. In the course of Izod's remarks to Ramsey, he advised her of an act that eliminated a rival seller, **thus promoting the objectives of the drug conspiracy,** and instructed her to maintain a low profile for the time being to avoid detection in light of the expected, increased law enforcement activity….

***Holt***, 273 A.3d at 545-46 (citation omitted; emphasis added).

Here, in contrast, Mason's statement served only to implicate Appellant and deny her own culpability, ***see Robins***, 812 A.2d at 522, and occurred only after she was detained. The Commonwealth failed to establish the statements were in furtherance of any objective of the Appellant/Barnes/Mason conspiracy.

Finally, the statements were not admissible as a statement against interest under Pa.R.E. 804(b)(3). Mason's statement blamed Appellant and attempted to exculpate Mason. As such, it was not against Mason's interest. ***See id.***

In summary, we conclude the admission of Mason's statement violated Appellant's constitutional confrontation rights guaranteed under the Sixth Amendment to the United States Constitution. Further, Mason's statement did not fall within any recognized exception to the rule against hearsay evidence. Under these circumstances, we conclude the trial court erred in admitting Officer Horton's testimony regarding Mason's statement.

Notwithstanding, our analysis does not end with this conclusion. "[A]n appellate court is not bound by the rationale of the trial court and may affirm on any basis if the record supports it." ***Commonwealth v. Martin***, 205 A.3d 1247, 1248 n.3 (Pa. Super. 2019) (citation omitted). In ***Commonwealth v. Fulton***, 179 A.3d 475 (Pa. 2018), our Supreme Court summarized the three scenarios in which an error may be found to be harmless:

> (1) [T]he error did not prejudice the defendant or the prejudice was *de minimis*; or
>
> ….
>
> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

***Id.*** at 493. We may *sua sponte* invoke the harmless error doctrine "as it does nothing more than affirm a valid judgment of sentence on an alternative basis." ***Commonwealth v. Hamlett***, 234 A.3d 486, 492 (Pa. 2020).

Upon review, we conclude that the improper admission of Mason's hearsay statement constituted harmless error. Appellant was convicted of two counts each of possession of narcotics, PWID, and criminal conspiracy to commit PWID. The statute governing PWID, 35 P.S. § 780-113(a)(30), prohibits "the … possession with intent to … deliver[] a controlled substance by a person not registered under this act...." ***Id.*** With respect to possession of a controlled substance, the Commonwealth was required to prove Appellant "[k]nowingly or intentionally possess[ed] a controlled … substance by a person

- 18 -

not registered under this act...." *Id.* § 780-113(a)(16). Appellant did not dispute that the controlled substances police found on Mason tested positive for methamphetamine and heroin/fentanyl. *See* N.T. (Vol. 2), 11/15/22, at 6-7 (stating the parties' stipulation to the contents of substances found in Mason's underwear).

"When contraband is not found on the defendant's person, the Commonwealth must establish constructive possession...." *Commonwealth v. Jones*, 874 A.2d 108, 121 (Pa. Super. 2005) (citation omitted).

> Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as conscious dominion. ... We subsequently defined conscious dominion as the power to control the contraband and the intent to exercise that control. ... To aid application, we have held that constructive possession may be established by the totality of the circumstances.

*Commonwealth v. Cruz*, 21 A.3d 1247, 1253 (Pa. Super. 2011) (citation and quotation marks omitted); *see also Commonwealth v. Johnson*, 26 A.3d 1078, 1094 (Pa. 2011) (stating that "circumstantial evidence may be used to establish constructive possession of the [contraband].").

Finally, Section 903 of the Crimes Code provides,

> [a] person is guilty of conspiracy with another person … to commit a crime if with the intent of promoting or facilitating its commission he agrees with such other person … that they or one or more of them will engage in conduct which constitutes such crime[.]

18 Pa.C.S.A. § 903(a)(1). "No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired." *Id.* § 903(e).

Our review of the record confirms the evidence overwhelmingly established (a) Appellant's constructive possession of the methamphetamine and heroin/fentanyl found on Mason; (b) his intent to deliver both controlled substances to Barnes; and (c) Appellant and Mason conspired to deliver both controlled substances to Barnes.

In addition to the evidence summarized above, at trial, Officer Horton testified regarding Mason's statement: "he made me hold the drugs from him." N.T. (Vol. I), 11/15/22, at 61. Officer Horton explained that while detained outside of Barnes's hotel room, Appellant continued to "object about [] having to stay there." *Id.* Appellant demonstrated his control over Mason by telling her "to keep her mouth shut[,] not to say anything[,] not to talk to us." *Id.* at 57. Appellant said this

> [n]umerous times. Keep your mouth shut. Don't talk to them.
> You don't have to say anything to them. Words to that effect
> numerous times.

*Id.* at 57.

Officer Hoffman testified at trial that she was called in to search three females following the above-described police raid. *Id.* at 81. While present at the scene,

Officer Horton advised me that [Mason] had to go to the bathroom, she was complaining of being on her period and [another officer] also made contact with me to say that [Mason] was fidgeting near her vagina.

….

I took [Mason] into the bathroom to search her.

….

So I did a complete pat down of her person and after I did that I asked her to drop her pants and in her underwear is where I found the drugs.

*Id.* at 82-83. According to Officer Hoffman, she found "a baggie that contained a couple packages[.]" *Id.* at 84. Officer Hoffman gave the drugs to another officer, who was standing outside of the door. *Id.*

Our review also discloses that Barnes testified at trial. Barnes explained that on January 5, 2022, she was selling "meth" and fentanyl/heroin from the Best Western Hotel. *Id.* at 88. Barnes stated she did not produce the drugs; she only sold them. *Id.* at 89. According to Barnes, when she ran low on drugs to sell, she would order more from Appellant. *Id.* at 89. Barnes testified that on January 5, 2022, she was running low on drugs to sell, so she "[m]ade a phone call and also sent text messages" to Appellant. *Id.* at 90. She confirmed the drugs never arrived at her hotel room, as police had entered the room, handcuffed everyone, and "confiscated the little amount that I had on me and then they … stopped [Appellant] at the elevator and handcuffed

him." *Id.* Barnes consented to a police search of her cell phone.[4] *Id.* at 92. At trial, Barnes described a screen shot of a text message she received from Appellant stating, "he's going to bring me stuff." *Id.* at 94.

Sayre Borough Police Officer Derek Watkins testified that on January 5, 2022, he was involved in the drug investigation at the Best Western Hotel. N.T. (Vol. II), 10/15/22, at 1. He testified that a female gave him the keys to her red Toyota on January 5, 2022. *Id.* at 3. The keys included a key fob. *See id.* When he activated the fob, a Toyota Camry in the Best Western's parking lot responded. *Id.* at 2. Officer Watkins testified that the Toyota was towed and impounded in the police parking lot. *Id.* at 10.

Upon searching the vehicle,[5] Officer Watkins found a black Armani leather bag containing "some cash US currency, there was some fentanyl, heroin and there were some ID cards that belonged to [Appellant]." *Id.* at 12. Specifically, the Armani bag contained $764.00, and approximately 40 grams of heroin/fentanyl. *Id.* at 22. According to Officer Watkins, these days heroin is "cut with more things such as fentanyl, soil fentanyl, [and]

---

[4] Barnes confirmed she pled guilty to charges resulting from this transaction: "I pled out to two felonies and a misdemeanor." N.T. (Vol. I), 11/15/22, at 96. In exchange, Barnes received a year of house arrest, two years Treatment Court and six years [of] parole." *Id.*

[5] Sergeant Hoffman testified that Officer Watkins had pointed out the vehicle in the Best Western parking lot. N.T. (Vol. II), 11/15/22, at 10. Sergeant Hoffman testified that he "found out who rented the car and the rental agreement was under [and] I contacted her. She signed a written consent for searching the car." *Id.*

tramadol[.]" *Id.* at 13. The identification cards found inside the bag included a casino loyalty card and an interim New York license issued in Appellant's name. *Id.* at 14. Officer Watkins also identified multiple Facebook photographs of Appellant, including one in which Appellant is carrying the same Armani bag. *Id.* at 19.

Officer Watkins testified that he additionally logged the drugs from Mason's underwear as evidence. *Id.* at 5. Upon the stipulation of counsel, Officer Watkins testified the packages contained 83.82 grams of crystal methamphetamine, and 17.9 grams of a powder that contained heroin, fentanyl, and tramadol. *Id.* at 7.

Commonwealth witness Madeline Brown (Brown) testified that on January 5, 2022, she loaned her Enterprise rental vehicle, a red Toyota, to Mason. *Id.* at 74-75. When she later contacted the police regarding the Toyota's impoundment, she consented to their search of the vehicle. *Id.* at 75-76. Brown sent Appellant a message, via Facebook, requesting her keys to the Toyota. *Id.* at 77. Although Appellant did not respond to the message, Brown found the keys in her mailbox later that day. *Id.*

Sergeant Hoffman confirmed that Brown's Toyota was towed and impounded by the Sayre Borough Police Department. N.T. (Vol. I), 11/15/22, at 10. Sergeant Hoffman explained,

> once I found out who rented the car and the rental agreement was under[,] I contacted [Brown]. She signed a written consent for searching the car.

*Id.* at 10.

In light of the foregoing trial evidence, we "conclude[] beyond a reasonable doubt that the error could not have contributed to the verdict[.]" *Mitchell*, 902 A.2d at 452 (citation omitted). Initially, we note that Mason's statement did not name Appellant as the person who had demanded that she carry the narcotics. Even without Mason's statement, the overwhelming evidence demonstrated Appellant's constructive possession of narcotics and his intent to deliver those narcotics to Barnes. *See* 35 P.S. §§ 780-113(a)(16), (30). The overwhelming evidence further established that Appellant, with the intent to commit PWID, conspired with Mason to travel to the Best Western and deliver both controlled substances to Barnes. Appellant further committed an overt act in furtherance of the conspiracy by traveling with Mason and the controlled substances to the Best Western. *See* 18 Pa.C.S.A. § 903(e) (requiring an overt act in furtherance of the conspiracy).

Because the evidence overwhelmingly supported Appellant's convictions, we conclude the trial court's improper admission of Mason's hearsay statement was *de minimis* and constituted harmless error. *See Fulton*, 179 A.3d at 493. Under these circumstances, we cannot grant Appellant relief on either of his issues.

Judgment of sentence affirmed.

Judge Stabile joins the memorandum.

Judge Bowes concurs in the result.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/30/2024